IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


RONALD SANDERS,

        Plaintiff,

v.                                    Civil Action No. 3:10cv113
                                    (Judge Bailey)

TERRY O'BRIEN, WALTER DOBUSHAK,
INERIO ALARION, MR. AHAZUMMA,
MR. WEAVER AND MR. BOYLES,

        Defendants.

## OPINION/REPORT AND RECOMMENDATION

### I.   Factual and Procedural History

The *pro se* plaintiff initiated this civil rights action on November 2, 2010 [dckt. 1].  In the complaint, the plaintiff alleges that the defendants were deliberately indifferent to his serious medical needs in violation of his constitutional rights, and also makes claims of medical negligence and medical malpractice under the Federal Tort Claims Act (FTCA).

On November 5, 2010, the undersigned conducted a preliminary review of the file, and noting the exigent circumstances of the plaintiff's medical claims, directed the defendant file an expedited answer to the complaint [dckt. 8].

On November 29, 2010, the defendants filed a Notice of Special Appearance and Motion to Dismiss or for Summary Judgment, with memorandum in support [dckt. 24 & 25].  Because the plaintiff is proceeding without counsel in this case, a Roseboro Notice was issued on December 7, 2010, advising the plaintiff of his right to file a response to the defendants' motion [dckt. 33].  The plaintiff filed a response to the defendants' motion on December 9, 2010 [dckt. 36].  This case is

therefore before the undersigned for a report and recommendation pursuant to LR PL P 2.

## II.   Contentions of the Parties

### A.   The Complaint

In the complaint, the plaintiff asserts that the defendants were deliberately indifferent to his serious medical needs. Complaint [dckt. 1] at 3. He also asserts claims of medical malpractice and medical negligence against the medical defendants. *Id.*

In support of his claims, the plaintiff asserts that on May 6, 2010, at approximately 4:45 a.m., he fell out of his top bunk while incarcerated at the Hazelton Penitentiary ("USP-Hazelton") in Bruceton Mills, West Virginia. *Id.* During the fall, the plaintiff struck his forehead on a chair and landed on both palms. *Id.* The impact of the fall drove the plaintiff's right and left-hand knuckles and bones up into his wrist, making him unable to move his fingers. *Id.* The plaintiff asserts that the fall broke the bones in his hands, shattered his wrist, and also broke a toe on his left foot. *Id.* The plaintiff's cellmate, Jeffrey Beard, witnessed his fall and assessed the injuries to the best of his ability. *Id.* Moreover, Mr. Beard pushed the panic button to "get [an] officer's attention," but was told that nothing could be done until 8:00 a.m. *Id.* at 4. The plaintiff asserts that he waited for more than three hours before receiving any type of help. *Id.*

When he was later taken to the medical department, the plaintiff was seen by Dr. Ahazumma, Dr. Dobushak and paramedic Gossit. *Id.* at 4. Also present was a female x-ray technician who took x-rays of the plaintiff's left hand. *Id.* According to the plaintiff, those present noticed only a fracture above his wrist and not his broken bone at the wrist. *Id.* At that time, Dr. Alarion wanted to put "only" a splint on the plaintiff's wrist, but Gossit stated that something more was needed. *Id.* Dr. Dobushak agreed and suggested a cast. *Id.* Ultimately, it was agreed that a cast would be placed on

the plaintiff's wrist and that act was done by Dr. Ahazumma. *Id.*

Despite his injuries, the plaintiff asserts that he did not receive any pain medication. *Id.* In fact, he asserts that it was two weeks before he received any pain medication at all. *Id.* Even then, however, the plaintiff asserts that "a specialist" ordered that he receive "Tylenol (3)," but that he only received a half day's dose when the prescription was for five days. *Id.* The plaintiff asserts that the medical department refused to give him the medication and also, only issued him a 16-day bottom bunk pass even though he had a cast on both arms. *Id.*

Approximately one month after his fall, the plaintiff was sent to an outside specialist. *Id.* At the specialist, a "blood sack" was drained from plaintiffs' arm. *Id.* The specialist allegedly told the plaintiff that the blood sac could cause gangrene, and that there was a "snapped bone" showing on his x-rays that would require immediate medical attention. *Id.* According to the plaintiff, the specialist wanted to operate on his shattered wrist that day, but that the Bureau of Prisons ("BOP") would not allow it. *Id.* at 5. Instead, the specialist placed a forearm cast on the plaintiff's left arm and advised him to come back for surgery. *Id.*

After returning back to the BOP facility, the plaintiff asserts that he went to sick call numerous times complaining of pain. *Id.* The plaintiff asserts that he was finally given 800 mg Ibuprofen and that he was told repeatedly he would be going for surgery. *Id.* The plaintiff asserts that this occurred over a period of four months, during which time, the same cast remained on his arm, even though he begged medical staff to remove it. *Id.* The plaintiff asserts that the cast started to emit a strong odor but that staff refused to remove it. *Id.* The cast was also causing his arm to swell and turn purple. *Id.* at 6.

On September 23, 2010, the plaintiff was seen by Dr. Alarion. *Id.* At that appointment, the

plaintiff was allegedly told he would be seeing the specialist in three weeks. *Id.* Nonetheless, the plaintiff asserts that his cast smelled so bad, and caused such excruciating pain, that he finally removed it himself. *Id.* Later that night, the plaintiff took a shower to "wash the stink off his arm." *Id.* However, the shower lacked rubber floor mats and the plaintiff asserts he slipped and fell on his arm again. *Id.* The plaintiff immediately reported the incident to Officer Williams, who called the medical department and spoke with a nurse. *Id.* The plaintiff was escorted to the medical department by another inmate where he was examined by two nurses. *Id.* at 6-7.

After examining the plaintiff, one of the nurses called Dr. Ahazumma who wanted to know why the plaintiff took his cast off. *Id.* at 7. The plaintiff told him the reasons he removed the cast. *Id.* After talking with Dr. Ahazumma, one of the nurses placed a cardboard splint on the plaintiff's wrist and told him that he had re-broken the wrist. *Id.* The plaintiff was also given an appointment slip to see a doctor the next day. *Id.*

At 8:03 a.m. the next day, the plaintiff arrived for his appointment with the doctor. *Id.* The plaintiff was seen by Dr. Alarion who allegedly told him there was nothing more that could be done. *Id.* When the plaintiff went back into the lobby, the Warden, two officers, paramedic Gossit, and Dr. Alarion also came into the lobby. The plaintiff asserts that the Warden told him that he would be getting nothing more for his arm and to not ask for anything else. *Id.* The Warden supposedly acknowledged that the plaintiff had written a BP-8 and BP-9 administrative remedy to him, asking for help in receiving proper care for his injured arm. *Id.* at 8. The Warden allegedly threatened to lock the plaintiff up if he asked for anything again. *Id.*

The plaintiff asserts that the Warden also advised Dr. Alarion that if the plaintiff came back to medical seeking treatment for his arm, the doctor was to call the Warden, so he could lock him

up.  *Id.*  The plaintiff also alleges that the Warden asked the nurse why the plaintiff was given a splint, but the plaintiff was unable to hear the nurse's response.  *Id.*  The Warden, however, stepped back into the lobby and told the plaintiff that he was lucky to have the splint.  *Id.*  As a result of these events, the plaintiff alleges that he filed a second BP-8 administrative remedy.  *Id.*

Attached to the complaint are what is purportedly the plaintiff's attempt to file administrative remedies.  *Id.* at Ex. 1-3. The plaintiff asserts that his remedies were thrown away, that his signature was forged on them, or that they were lost or ignored.  *Id.* at 9.  On August 31, 2010, the plaintiff asserts that he was told by Mr. Boyd, the Health Services Administrator, that the plaintiff's remedies had been dropped.  *Id.*  The plaintiff asserts that this is untrue and that his signature was forged on those documents.  *Id.*  Moreover, the plaintiff contends that he gave copies of his BP-8 and BP-9 administrative remedy forms directly to the Warden on August 25, 2010. *Id.*  The Warden said he would look into the matter.  Id.  On September 13, 2010, the plaintiff received a response from the Warden stating that the plaintiff had been receiving medical care for his arm injuries.  *Id.* at Ex. 9. On September 14, 2010, the plaintiff filed another informal administrative remedy alleging that he had not been receiving proper treatment for his arm.  *Id.* at Ex. 10.  The plaintiff asserts that he never received a response.  *Id.*

After this time, the plaintiff continued to seek medical attention for his injured arms.  *Id.* at 11.  Moreover, he continued to seek pain medication, but never received any.  *Id.*  During this time, the plaintiff contends that a "blood egg" formed on his arm which he had to ice down.  *Id.*  He could also feel his bones rubbing together.  *Id.*

On September 27, 2010, as the plaintiff was pushing himself up from a table, he felt the bones in his wrists pop, and noticed that the "blood egg" got bigger.  *Id.*

On September 29, 2010, the plaintiff asserts that he spoke with Mrs. Doyle who advised him that a panel had convened to discuss the plaintiff's arm injuries and decided that further medical intervention was appropriate. *Id.*

On October 1, 2010, the plaintiff went to see Dr. Ahazumma. *Id.* At that time, the specialist, Dr. O'Malley, was also present and the plaintiff was told he could have his cast cut off. *Id.* at 11-12. The cast was not removed. *Id.* at 12. At this appointment, Dr. Alarion asked the plaintiff why he had not come to medical after he fell in the shower. *Id.* The plaintiff stated that he had come to medical. *Id.* The plaintiff contends that Dr. Alarion then advised him he was scheduled to see a surgeon the next week. *Id.* Moreover, Dr. O'Malley told the plaintiff that he would have pain for the rest of his life, and wrote the plaintiff a prescription for Tylenol 3. *Id.* The plaintiff alleges, however, that he never received the medication. *Id.* The plaintiff asserts that he asked for his medication on October 13, 2010, but was told that the doctor had not "signed off" on the prescription and that he could not receive it. *Id.*

On October 15, 2010, the plaintiff was taken to see an outside specialist. *Id.* At the time, the plaintiff thought he was going for surgery. *Id.* Nevertheless, it turned out that the appointment was merely for a second opinion. *Id.* At that appointment, the plaintiff was again x-rayed. *Id.* The specialist allegedly told the plaintiff that he could perform surgery on the plaintiff's arms and fix his injuries in 45 minutes. *Id.* However, the officer escorting the plaintiff to the appointment stated that surgery was not on the orders and the plaintiff was returned to the BOP with nothing more than a prescription for pain medication. *Id.* at 13. Upon arrival, Mrs. Church allegedly tore up the plaintiff's prescription saying, "you don't need this." *Id.*

On October 19, 2010, the plaintiff asserts that he returned to the medical department and

asked for a wrist brace. *Id.* He was allegedly told that they did not have any. *Id.* The plaintiff requested an administrative remedy form and mailed it out the next day. *Id.*

As a result of these alleged events, the plaintiff asserts that he is in need of emergency medical attention. *Id.* at 14. The plaintiff asserts that he cannot use his hand properly and there are bones pushing up against his skin causing excruciating pain. *Id.* The plaintiff asserts that he has suffered various injuries and that he is entitled to an award of damages. *Id.* Moreover, he seeks proper medical attention, including surgery on his wrist. *Id.*

**B.    The Defendants' Motion**

In response to the complaint, the defendants, appearing specially,[1] assert that the plaintiff is not entitled to relief for the following reasons:

(1) he has failed to fully exhaust his administrative remedies; and

(2) his claims for emergency medical relief are not supported by his medical record.

[Dckt. 25 at 10-16].

In support of these contentions, the defendants assert that the plaintiff has not filed any administrative tort claim with the BOP regarding his claim of medical malpractice, and that those claims must therefore be dismissed. [Dckt. 25 at 10]. As to his deliberate indifference claims, the defendants assert that it is clear from the face of the complaint that the plaintiff has not exhausted his administrative remedies under the Prison Litigation Reform Act ("PLRA"), and that those claims should also be dismissed. *Id.* at 11-15.

---

[1]In their motion, the defendants assert that due to the expedited response time, they did not have adequate time to secure proper representation authorization. [Dckt. 24 at 2] However, being that the defendants were served process on November 9, 2010, and the United States Attorney was served process on November 10, 2010, and it has now been well over 60 days since service was effected, that is likely a non-issue at this point.

As to the substance of the plaintiff's claims, the defendants argue that the plaintiff appears to equate proper medical care solely with his demand for surgery on his wrist. *Id.* at 15. However, the defendants assert that the plaintiff has received repeated and continuous treatment of his wrist injuries. *Id.* In fact, the defendants assert that the plaintiff has had several outside orthopedic consults, has been prescribed appropriate pain medications, has been assessed and evaluated upon request, and has had other tests and procedures performed in response to his complaints. *Id.* Moreover, the defendants assert that they have complied with the opinions, recommendations and treatment plans of the outside specialists. *Id.* At no time, assert the defendants, has any outside specialist ever found surgery medically necessary in the plaintiff's case. *Id.* To the contrary, the defendants assert that the plaintiff's medical records show that the specialists have recommended physical therapy, rather than surgery, and have in fact stated that surgery is merely elective and can be, "address[ed] down the road." *Id.* at 16. Moreover, when offered surgery as an option in June of 2010, the defendants assert that the plaintiff affirmatively told the specialist that his preference was to not have surgery. *Id.*

For these reasons, the defendants assert that the plaintiff's complaint should either be dismissed, or judgment granted in their favor. *Id.*

## C. **The Plaintiff's Opposition to the Defendants' Motion**

In his response to the defendants' motion, the plaintiff asserts that the defendants are not entitled to summary judgment because genuine issues of material fact still exist. [Dckt. 36 at 1] In addition, he asserts that he should not have to exhaust his administrative remedies because his case involves a claim that he needs immediate medical attention. *Id.* Moreover, the plaintiff argues that he set forth adequate facts and exhibits which establish both of his claims. *Id.*

In support of these arguments the plaintiff asserts that he has attempted to exhaust his administrative remedies but that the BOP has interfered with that process by forging his signature and through other means. *Id.* at 2, 4-6, 8. He also contends that he was told by the specialist that surgery is needed to properly repair his injuries. *Id.* at 2-3. He asserts that the defendants are aware of his need for surgery and have simply failed to follow through. *Id.* at 3. Moreover, the plaintiff asserts that his injuries are obvious even to a layperson, and that the defendants have direct knowledge of the extent of his injuries and his excruciating pain, yet they have failed to provide him adequate medical care. *Id.* at 7-10. The plaintiff asserts that he has provided affidavits and records which establish these facts. *Id.* at 3. Thus, he contends that neither dismissal nor summary judgment is appropriate. *Id.* at 4, 10.

### III.  Standard of Review

**A.  Motion to Dismiss**

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir.1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. Mylan Labs, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir.1993); see also Martin, 980 F.2d at 952.

The Federal Rules of Civil Procedure "require[ ] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544,

555 (2007) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)). Courts long have cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief." <u>Conley</u>, 355 U.S. at 45-46. In <u>Twombly</u>, the United States Supreme Court noted that a complaint need not assert "detailed factual allegations," but "must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." <u>Conley</u>, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Id.* (citations omitted), to one that is "plausible on its face," *Id.* at 570, rather than merely "conceivable." *Id.* Therefore, in order for a complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." <u>Bass v. E. I. DuPont de Nemours & Co.</u>, 324 F.3d 761, 765 (4th Cir.2003) (citing <u>Dickson v. Microsoft Corp.</u>, 309 F.3d 193, 213 (4th Cir.2002); <u>Iodice v. United States</u>, 289 F.3d 279, 281 (4th Cir.2002)). In so doing, the complaint must meet a "plausibility" standard, adopted by the Supreme Court in <u>Ashcroft v. Iqbal</u>, where it held that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949 (2009). Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" in order to meet the plausibility standard and survive dismissal for failure to state a claim. *Id.*

**B.**   <u>**Motion for Summary Judgment**</u>

Under the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled

to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

In <u>Celotex</u>, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. <u>Celotex</u> at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." <u>Matsushita Electric Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). The nonmoving party must present specific facts showing the existence of a genuine issue for trial. *Id.* This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson</u> at 256. The "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent the entry of summary judgment. *Id.* at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." <u>Matsushita</u>, at 587 (citation omitted).

## IV. <u>Analysis</u>

### A. <u>Exhaustion of Administrative Remedies</u>

#### 1. <u>Federal Tort Claims Act</u>

As an initial matter, the undersigned notes that the FTCA provides that a suit against the *United States* shall be the exclusive remedy for persons with claims for damages resulting from the

actions of federal employees taken within the scope of their office or employment.  See 28 U.S.C. § 2679 (emphasis added).  Therefore, with regard to the plaintiff's claims under the FTCA,  the United States should be substituted for the individually named defendants.

The disposition of a tort claim by a federal agency is a prerequisite to initiating suit in the district court.  28 U.S.C. § 2675.  Section 2675(a) states:

> [a]n action shall not be instituted . . . against the United States for money damages for injury . . . caused by the negligent or wrongful act or omission of any employee . . . while acting within the scope of . . . employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing . . . The failure of an agency to make final disposition of a claim within six months after it is filed shall . . . be deemed a final denial of the claim for purposes of this section.

A claim is deemed presented "when a federal agency receives from a claimant . . . an executed Standard Form 95 or other written notification of an incident, accompanied by a claim for money damages in a sum certain for injury to or loss of property, personal injury, or death alleged to have occurred by reason of the incident."  28 C.F.R. § 14.2(a).

In his case, the defendants assert that the plaintiff has not filed any administrative tort claim with the BOP for medical malpractice related to the injuries he first sustained on May 6, 2009.  See [Dckt. 26], Defs' Ex. 2, Declaration of Clarissa Owens, at ¶ 8 and Att. D.  The plaintiff does not dispute this claim.  Instead, he argues that he should not have to exhaust his administrative remedies since he seeks needed medical attention. [Dckt. 36 at 1] However, as noted above, the disposition of a tort claim by a federal agency is a prerequisite to initiating suit in the district court. 28 U.S.C. § 2675.  Moreover, there are no exceptions to this requirement for medical or any other reasons. § 2675(a).  Accordingly, the plaintiff's intentional tort claims – medical negligence and medical

malpractice – must be dismissed without prejudice for the failure to exhaust.

## 2. Plaintiff's Deliberate Indifference Claims

Under the PLRA, a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983, or any other federal law, must first exhaust all available administrative remedies. 42 U.S.C. § 1997(e)(a). Exhaustion as provided in § 1997(e)(a) is mandatory. Booth v. Churner, 532 U.S. 731, 741 (2001). A Bivens[2] action, like an action under 42 U.S.C. § 1983, is subject to the exhaust of administrative remedies. Porter v. Nussle, 534 U.S. 516, 524 (2002). The exhaustion of administrative remedies "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes,"[3] and is required even when the relief sought is not available. Booth at 741. Because exhaustion is a prerequisite to suit, all available administrative remedies must be exhausted *prior to* filing a complaint in federal court. See Porter, at 524 (citing Booth, 532 U.S. at 741) (emphasis added).

Moreover, in Woodford v. Ngo, 548 U.S. 81, 84-85 (2006), the United States Supreme Court found that the PLRA's exhaustion requirement serves three main purposes: (1) to "eliminate unwarranted federal court interference with the administration of prisons"; (2) to "afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case"; and (3) to "reduce the quantity and improve the quality of prisoner suits." Therefore, "the PLRA exhaustion requirement requires *full* and *proper* exhaustion." Woodford at 92-94 (emphasis added). Full and proper exhaustion includes meeting all the time and procedural

---

[2] Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388 (1971)(authorizing suits against federal actors in their individual capacities for constitutional violations).

[3] *Id.*

requirements of the prison grievance system. *Id.* at 101-102.

Nonetheless, several courts have found that the mandatory exhaustion requirement may be excused in certain limited circumstances. See Dale v. Lappin, 376 F.3d 652, 656 (7th Cir. 2004) (prison's administrative remedies can be rendered "unavailable" for purposes of exhaustion when officials refuse to provide an inmate with required grievance forms); Ziemba v. Wezner, 366 F.3d 161 (2d Cir. 2004) (defendant may be estopped from asserting exhaustion as a defense, where the defendant's actions render the grievance procedure unavailable); Mitchell v. Horn, 318 F.3d 523, 529 (3d Cir. 2003) (summary dismissal for failure to exhaust not appropriate where prisoner was denied forms necessary to complete administrative exhaustion); Aceves v. Swanson, 75 Fed.Appx. 295, 296 (5th Cir. 2003) (remedies are effectively unavailable where prison officials refuse to give inmate grievance forms upon request); Miller v. Norris, 247 F.3d 736, 740 (8th Cir. 2001) (a remedy is not available within the meaning of § 1997e(a) when prison officials prevent a prisoner from utilizing such remedy); Dotson v. Allen, 2006 WL 2945967 (S.D.Ga. Oct. 13, 2006) (dismissal for failure to exhaust not appropriate where plaintiff argues that failure to exhaust was direct result of prison official's failure to provide him with the necessary appeal forms).

The BOP makes available to its inmates a three level administrative remedy process if informal resolution procedures fail to achieve sufficient results. See 28 C.F.R. § 542.10, et seq. This process is begun by filing a Request for Administrative Remedy at the institution where the inmate is incarcerated. If the inmate's complaint is denied at the institutional level, he may appeal that decision to the Regional Office for the geographic region in which the inmate's institution of confinement is located. (For inmates confined at USP-Hazelton, those appeals are sent to the Mid-Atlantic Regional Director in Annapolis Junction, Maryland.) If the Regional Office denies relief,

the inmate can appeal to the Office of General Counsel via a Central Office Administrative Remedy Appeal. An inmate must fully complete each level of the process in order to properly exhaust his administrative remedies.

In this case, the plaintiff concedes that he did not fully and completely exhaust his <u>Bivens</u> claims. He asserts, however, that BOP officials interfered with his ability to do so, and he should therefore not be required to complete exhaustion. In support of this contention, the plaintiff asserts that he filed a BP-8 and BP-9 at the institution, only to be told that those remedies had been withdrawn. The plaintiff, however, insists that he never withdrew those remedies. In addition, the plaintiff asserts that he attempted to file administrative remedies, but that they were lost or ignored. When he then attempted to initiate the grievance procedure at the regional level, his remedy was rejected as not sensitive, and he was advised that he would have to first exhaust at the institutional level.[4] Having already tried that, and after allegedly being hindered in every attempt, the plaintiff asserts that he chose instead to initiate suit in this Court. The defendants fail to address these claims in their motion.

Although it is clear that the plaintiff did not exhaust his administrative remedies prior to

---

[4]Although the defendants argue that the plaintiff never filed any remedies at the institutional level, the court notes that the plaintiff provides copies of several informal and formal administrative remedy requests that he purportedly made. <u>See</u> [Dckt. 1] at Ex. 2-11. In fact, at one point, the plaintiff received a response from the Warden stating,

> This is in response to your Inmate Request to Staff in which you request assistance for your arm complaints.
> A review of the record indicates you have been seen by the institution physician and our Mid-Level Providers. You were also seen by the orthopedic specialist, both in-house and outside specialist. You are pending another appointment for surgical referral. You were provided pain medications at the physicians discretion.

*Id.* at Ex. 9.

filing suit, a question of fact remains as to whether staff hindered or interfered with the plaintiff's ability to properly exhaust his administrative remedies prior to filing suit. Thus, the defendant's motion to dismiss the plaintiff's <u>Bivens</u> claims for the failure to exhaust should be denied.

## B.  Deliberate Indifference

To state a claim under the Eighth Amendment for ineffective medical assistance, the plaintiff must show that the defendants acted with deliberate indifference to his serious medical needs. <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976). To succeed on an Eighth Amendment "cruel and unusual punishment" claim, a prisoner must prove two elements: (1) that objectively the deprivation of a basic human need was "sufficiently serious," and (2) that subjectively the prison official acted with a "sufficiently culpable state of mind." <u>Wilson v. Seiter</u>, 501 U.S. 294, 298 (1991).

A serious medical condition is one that has been diagnosed by a physician as mandating treatment or that is so obvious that even a lay person would recognize the need for a doctor's attention. <u>Gaudreault v. Municipality of Salem, Mass.</u>, 923 F.2d 203, 208 (1st Cir. 1990), <u>cert. denied</u>, 500 U.S. 956 (1991). A medical condition is also serious if a delay in treatment causes a lifelong handicap or permanent loss. <u>Monmouth County Corr. Inst. Inmates v. Lanzaro</u>, 834 F.2d 326, 347 (3rd Cir. 1987), <u>cert. denied</u>, 486 U.S. 1006 (1988).

The subjective component of a cruel and unusual punishment claim is satisfied by showing that the prison official acted with deliberate indifference. <u>Wilson</u>, 501 U.S. at 303. A finding of deliberate indifference requires more than a showing of negligence. <u>Farmer v. Brennan</u>, 511 U.S. 825, 835 (1994). A prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <em>Id.</em> at 837. A prison official is not liable if he "knew the underlying facts but believed (albeit unsoundly) that

the risk to which the fact gave rise was insubstantial of nonexistent." *Id.* at 844.

"To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment, [or lack thereof], must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990). A mere disagreement between the inmate and the prison's medical staff as to the inmate's diagnosis or course of treatment does not support a claim of cruel and unusual punishment unless exceptional circumstances exist. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). A constitutional violation is established when "government officials show deliberate indifference to those medical needs which have been diagnosed as mandating treatment, conditions which obviously require medical attention, conditions which significantly affect an individual's daily life activities, or conditions which cause pain, discomfort or a threat to good health." See Morales Feliciano v. Calderon Serra, 300 F.Supp.2d 321, 341 (D.P.R. 2004) (citing Brock v. Wright, 315 F.3d 158, 162 (2d Cir. 2003)).

The plaintiff medical records establish the following with regard to the treatment of his injured hands and wrists:

(1) On May 6, 2009, the plaintiff reported to Health Services at approximately 7:06 a.m. alleging that he injured himself upon falling out of the top bunk. [Dckt. 28], Defs Ex. 2, Declaration of Brett Friend ("Friend Declaration") at ¶ 4, Att. A. At that time, the plaintiff reported that both of his hands were broken and he felt dizzy. *Id.* The plaintiff was referred to x-ray and was prescribed 800 mg of Ibuprofen every six hours for three days. *Id.*

(2) Due to multiple fractures on both wrists, at 9:23 a.m. medical staff applied a full cast on plaintiffs' left hand and a partial cast on the plaintiff's right hand. *Id.* at ¶ 5, Att. A. He was also

referred for a consult with an orthopedic specialist. *Id.*

(3) On May 10, 2010, the plaintiff was again seen by a health services physician. *Id.* at ¶ 6, Att. A. At that time, it was noted on the plaintiff's medical chart that his fingers were warm, there was no skin discoloration, his pain had decreased, and he could perform his daily activities. *Id.*

(4) The plaintiff received an orthopedic consult on May 26, 2010. *Id.* at ¶ 7, Att. A. It was recommended that the plaintiff receive a consult for orthopedic surgery. *Id.*

(5) Upon his return to the facility, the plaintiff received a follow-up examination with a health services physician. *Id.* at ¶ 8, Att. A.

(6) On June 8, 2010, the plaintiff reported to health services contending that he had fallen in the shower the previous evening. *Id.* at ¶ 9, Att. A. It was observed that the plaintiff did not have a cast on his left arm. *Id.* Moreover, it was noted that he had movement in his arm and there was no further pain or swelling. *Id.* The plaintiff was advised to keep his left wrist immobile and an Ace bandage was applied. *Id.* Follow-up x-rays were requested and it was noted that the plaintiff was due to see the orthopedic surgeon on June 24, 2010. *Id.*

(7) On June 10, 2010, the plaintiff reported to health services complaining of pain in his right wrist and hand from falling in the shower the previous day and breaking the cast on his right forearm. *Id.* at ¶ 10, Att. A. No skin discoloration was present and only minimal swelling. *Id.* An x-ray was taken which revealed a displaced fracture. *Id.* The plaintiff was prescribed Acetaminophen/Codeine 300/30 two times a day for seven days. *Id.*

(8) On June 14, 2010, a second cast was placed on the plaintiff's left wrist. *Id.* at ¶ 11.

(9) On June 17, 2010, the plaintiff had an orthopedic consultation with Dr. O'Malley at Mountainstate Orthopedic Associates, Inc. *Id.* at ¶ 12, Att. B. At that appointment, the plaintiff

reported having stiffness and swelling in his right hand. *Id.* Dr. O'Malley opined that in order to restore some sort of improved anatomy to the plaintiff's wrist, a large operative procedure would be required. *Id.* Alternatively, they could allow the plaintiff's fracture to continue healing for two to three weeks and then concentrate on regaining wrist flexion and extension. *Id.* Once that happened, the plaintiff could elect to have a resection of the distal ulna. *Id.* The plaintiff chose to not have surgery at that time, but to allow the fracture to heal and then have physical therapy. *Id.* Dr. O'Malley therefore applied a short arm cast and scheduled the plaintiff for further x-rays to determine whether his radius had adequately healed. *Id.* Dr. O'Malley also stated that it would take several months for the plaintiff to regain his full range of motion and be considered a candidate for distal ulna resection. *Id.*

(10) When the plaintiff arrived back at the facility, he received an institutional follow-up where it was noted that he had received a short arm cast on his left forearm and that his fingers were mobile and without discoloration or swelling. *Id.* at ¶ 13, Att. A.

(11) On July 27, 2010, the plaintiff reported to health services that he had struck his casted arm on a door frame the previous week and that he was in pain. *Id.* at ¶ 14, Att. A. Although no swelling or discoloration was noted on his hand, x-rays were ordered. *Id.*

(12) On August 18, 2010, the plaintiff reported to health services complaining of pain in his left wrist. *Id.* at ¶ 15, Att. A. He also requested a surgery consult which was granted and scheduled. *Id.*

(13) On September 7, 2010, the plaintiff again reported to health services complaining of pain in his casted left arm. *Id.* at ¶ 16, Att. A. He was referred to a physician and seen later that day. *Id.* The doctor noted that the plaintiff had full range of motion and normal circulation. *Id.* The

plaintiff was prescribed Ibuprofen 800 mg every 12 hours for 90 days. *Id.*

(14) On September 23, 2010, the plaintiff reported to health services complaining that he had fallen onto his left wrist the previous evening. *Id.* at ¶ 17, Att. A. At that time, he had decreased range of active and passive motion, and that the wrist appeared deformed, although it could not be determined whether that deformity resulted from the new injury or a previous one. *Id.* Further, his left hand was warm to the touch and displayed positive capillary refill even though there was limited range of motion. *Id.* The plaintiff received a cardboard splint and was told to report to health services the following day. *Id.*

(15) The plaintiff reported to health services on October 1, 2010. *Id.* at ¶ 19, Att. A. He complained about his cast but was told by Dr. Azumah that these issues had already been addressed. *Id.*

(16) On October 5, 2010, the plaintiff received another orthopedic consult with Dr. O'Malley. *Id.* at ¶ 20, Att. C. New x-rays were taken which showed that the left wrist fracture was completely healed with some malposition. *Id.* Dr. O'Malley found that the best treatment option at that time was to conduct warm soaks and active range of motion exercises for a few months to try to regain full motion and function in the hand. *Id.* Additionally, Dr. O'Malley noted that a lot of people with the plaintiff's type of deformity did very well without surgery. *Id.* Dr. O'Malley outlined two different surgical options that the plaintiff could elect to correct his deformity, but recommended surgery only if the plaintiff became symptomatic with carpal instability pattern later on. *Id.* Dr. O'Malley noted that the plaintiff did not have carpal instability at that time. *Id.* Because Dr. O'Malley found that the plaintiff had "years to address the problems down the road," he stated that he would continue to see the plaintiff as needed. *Id.*

(17) After returning to the facility, the plaintiff received a follow-up consultation with health services. *Id.* at ¶ 21, Att. A. The plaintiff was advised to return to health services in one week after receipt of Dr. O'Malley's report to form a plan of care. *Id.*

(18) On October 19, 2010, the plaintiff returned to health services to discuss Dr. O'Malley's recommended plan of care. *Id.* ¶ 22, Att. A. The plaintiff indicated that he understood the plan of care and requested a wrist brace for stability of his left wrist. *Id.* A brace was ordered. *Id.*

It is clear from the plaintiff's uncontested medical records that the defendants have not been deliberately indifferent to his serious medical needs with regard to the adequacy of his medical care. The defendants have repeatedly and consistent examined the plaintiff, performed necessary tests, addressed his complaints in a timely manner, prescribed him medications and referred him to an appropriate specialist. Thus, to the extent that the plaintiff claims, generally, that his care has been so inadequate as to violate the Eighth Amendment, that claim is clearly refuted by the record, and the defendants are entitled to judgment as a matter of law. Nonetheless, the plaintiff makes several specific claims of deliberate indifference apart from the general care he has received.

1. <u>Failure to Provide Necessary Surgery</u>

With regard to this claim, the plaintiff asserts that the orthopedic specialist has found that surgery is necessary to properly correct his injuries and that the defendants have failed to provide him with the required surgery. This claim is clearly refuted by the record.

Dr. O'Malley's letter of June 17, 2010 states in pertinent part:

> As far as the distal radius fracture, we talked at length. It would be better for him if we could restore some sort of improved anatomy. Unfortunately, to bring the distal radius back out to length, I a (sic) pretty large operative procedure. It would require a segmental bone graft with significant chance of failure to heal, as well as open reduction, internal and/or external fixation and a lot of physical therapy thereafter. The alternative to that kind of

reconstructive procedure would be to allow the fracture to continue to heal which should be accomplished within the next two or three weeks. After that, he could concentrate on regaining wrist flexion and extension, expecting that the DRUJ will be a chronic problem for him. [O]nce he has regained wrist motion, however he could electively have a Darrach type of resection of the distal ulna, thus taking care of the length inequality in the forearm and doing so with a much smaller and elective operative procedure. The patient said that is the way he would like to go.

Dckt. 26, Defs' Ex. 2, Att. B.

Dr. O'Malley's letter of October 5, 2010, states in pertinent part:

I discussed treatment options. Right now his best bet would be warm soaks, active range of motion exercises, and a few months to try to regain motion and function in the hand. I have seen a lot of people with this type of deformity do very well without the need for further surgery. If he does not, then he can electively have things fixed up later. Options would be a radial lengthening osteoplasty with bone graft which is going to be a very big deal. Probably a better choice would be an ulnar shortening osteoplasty with tendon transfer which would obviate the need for bone healing and address the radioulnar mismatch, as well as the ulnar impaction. I would only suggest a correction of his dorsal tilt and loss of radial inclination by radial osteotomy if he becomes symptomatic with carpal instability pattern later on. He doesn't have that now. He has years to address these problems down the road. I'll see him . . . if he requires that.

Id. at Att. C.

It is clear from these documents that Dr. O'Malley has never found that surgery is required to properly correct the plaintiff's injuries. At best, Dr. O'Malley has suggested several treatment options for the plaintiff's injuries, one of which is *elective* surgery. However, at his first orthopedic consult, the plaintiff himself, when given the options, decided to forego surgery for less invasive treatment. In addition, as late as October of 2010, Dr. O'Malley has found that the plaintiff is not yet a candidate for elective surgery. In fact, Dr. O'Malley suggests that it will be several months before the plaintiff is even a candidate for surgery. Thus, to the extent that the plaintiff asserts that the defendants have been deliberately indifferent to his serious medical needs for failing to provide

him with necessary surgery, that claim is clearly refuted by the record and the defendants are entitled to judgment as a matter of law.

2.   Failure to Provide a Wrist Brace

In this ground, the plaintiff asserts that he was refused a wrist brace when he requested one. This does not appear to be an accurate representation of the facts. The undisputed facts show that a wrist brace was simply not available and had to be ordered. Thus, the plaintiff was not *refused* a wrist brace, and the defendants are also entitled to judgment as a matter of law.

3.   Failure to Provide Pain Medications

Although the plaintiff's medical records clearly show that he has been prescribed ample medication to manage his pain, the defendants have not addressed the plaintiff's claim that although prescribed, they have failed to provide the medication. The Court can find no record in the plaintiff's medical files that show that he actually received the prescribed pain medications. Therefore, there is a material issue of fact which remains with regard to this claim and the defendants are not entitled to summary judgment at this time.

## V.   Recommendation

For the reasons stated, the undersigned recommends that the defendants' Motion to Dismiss or for Summary Judgment (dckt. 24) be **GRANTED in part** and **DENIED in part**. Specifically, the undersigned recommends that:

(1) the defendants' motion be **GRANTED to the extent** that it requests that the plaintiff's FTCA claims be dismissed without prejudice for the failure to exhaust;

(2) the defendants' motion to dismiss be **DENIED to the extent** that it requests that the plaintiff's Bivens claims be dismissed without prejudice for the failure to exhaust;

(3) the defendants' motion for summary judgment be **GRANTED to the extent** that the plaintiff claims that the defendants have been deliberately indifferent to his serious medical needs with respect to the overall adequacy of the care provided and with respect to the requested wrist brace; and

(4) the defendant's motion for summary judgment be **DENIED to the extent** that the plaintiff claims that the defendants have been deliberately indifferent to his serious medical needs with respect to his claim that he has been denied his prescribed pain medications.

Within **fourteen (14) days** after being served with a copy of this Opinion/Report and Recommendation, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of any objections should also be submitted to the Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk is directed to send a copy of this Opinion/Report and Recommendation to the *pro se* plaintiff by certified mail, return receipt requested, to his last known address as shown on the docket, and to counsel of record via electronic means.

DATED: February 1, 2011.

*John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE