**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**


**RONALD SANDERS,**

        Plaintiff,

v.

                                     **CIVIL ACTION NO. 3:10-CV-113
(BAILEY)**

**TERRY O'BRIEN, WALTER DOBUSHAK,
INERIO ALARION, MR. AHAZUMMA,
MR. WEAVER AND MR. BOYLES,**

        Defendants.


**ORDER ADOPTING IN PART AND DECLINING TO ADOPT IN PART
OPINION/REPORT AND RECOMMENDATION**

<u>I.</u>     <u>Introduction</u>

On this day, the above-styled matter came before this Court for consideration of the

Opinion/Report and Recommendation of United States Magistrate Judge John S. Kaull.

Pursuant to this Court's Local Rules, this action was referred to Magistrate Judge Kaull for

submission of a report and a recommendation ("R&R"). Magistrate Judge Kaull filed his

R&R on February 2, 2011 [Doc. 40]. In that filing, the magistrate judge recommended that

this Court grant in part and deny in part the defendants' Motion to Dismiss, or in the

Alternative, for Summary Judgment [Doc. 24].

Pursuant to 28 U.S.C. § 636(b)(1)(c), this Court is required to make a *de novo*

review of those portions of the magistrate judge's findings to which objection is made.

However, the Court is not required to review, under a *de novo* or any other standard, the

factual or legal conclusions of the magistrate judge as to those portions of the findings or recommendation to which no objections are addressed. *Thomas v. Arn*, 474 U.S. 140, 150 (1985). In addition, failure to file timely objections constitutes a waiver of *de novo* review and the right to appeal this Court's Order. 28 U.S.C. § 636(b)(1); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984). Here, objections to Magistrate Judge Kaull's R&R were due within fourteen (14) days of receipt, pursuant to 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b). Plaintiff Sanders timely filed various objections [Docs. 43, 53, 62 & 63]. The defendants filed their Objections [Doc. 46] on February 16, 2011. Accordingly, this Court will review the portions of the report and recommendation to which the parties objected *de novo.* The remaining portions will be reviewed for clear error.

II.     Factual and Procedural Background

    A.      Plaintiff's Complaint

    In his Complaint, the plaintiff asserts that the defendants were deliberately indifferent to his serious medical needs. [Doc. 1] at 3. He also asserts claims of medical malpractice and medical negligence against the medical defendants. Id.

    In support of his claims, the plaintiff asserts that on May 6, 2010, at approximately 4:45 a.m., he fell out of his top bunk bed while incarcerated at the Hazelton Penitentiary ("USP-Hazelton") in Bruceton Mills, West Virginia. Id. During the fall, the plaintiff struck his forehead on a chair and landed on both palms. Id. The impact of the fall drove the plaintiff's right and left-hand knuckles and bones up into his wrist, rendering his fingers immobile. Id. The plaintiff asserts that the fall broke the bones in his hands, shattered his

wrist, and broke a toe on his left foot.  Id.  The plaintiff's cellmate, Jeffrey Beard, witnessed his fall and pushed the panic button to "get [an] officer's attention," but was told that nothing could be done until 8:00 a.m.  Id. at 4.  The plaintiff asserts that he waited for more than three hours before receiving assistance.  Id.

When he was later taken to the medical department, the plaintiff was seen by Dr. Ahazumma, Dr. Dobushak and paramedic Gossit.  Id. at 4.  An x-ray technician took x-rays of the plaintiff's left hand.  Id.  According to the plaintiff, those present noticed only a fracture above his wrist and not his broken bone at the wrist.  Id.  At that time, Dr. Alarion wanted to put "only" a splint on the plaintiff's wrist, but Gossit stated that something more was needed.  Id.  Dr. Dobushak agreed and suggested a cast.  Id.  Ultimately, Dr. Ahazumma placed a cast on the plaintiff's wrist.  Id.

Despite his injuries, the plaintiff asserts that it was two weeks before he received any pain medication.  Id.  Even then, however, the plaintiff asserts that "a specialist" ordered that he receive "Tylenol (3)," but that he only received a half day's dose when the prescription was for five days.  Id.  The plaintiff asserts that the medical department refused to give him the medication and also, only issued him a 16-day bottom bunk pass despite having casts on his arms.  Id.

Approximately one month after his fall, the plaintiff was sent to an outside specialist. Id.  At the specialist, a "blood sack" was drained from the plaintiff's arm.  Id.  The specialist allegedly told the plaintiff that the blood sack could cause gangrene and that there was a "snapped bone" showing on his x-rays that would require immediate medical attention.  Id. According to the plaintiff, the specialist wanted to operate on his shattered wrist that day,

but the Bureau of Prisons ("BOP") would not allow it. Id. at 5. Instead, the specialist placed a forearm cast on the plaintiff's left arm and advised him to come back for surgery. Id.

After returning to the BOP facility, the plaintiff asserts that he went to sick call numerous times complaining of pain. Id. The plaintiff asserts that he was finally given 800 mg Ibuprofen and that he was told repeatedly he would be going for surgery. Id. The plaintiff asserts that this occurred over a period of four months, during which time, the same cast remained on his arm, even though he begged medical staff to remove it. Id. The plaintiff asserts that the cast started to emit a strong odor but that staff refused to remove it. Id. The cast was also causing his arm to swell and turn purple. Id. at 6.

On September 23, 2010, the plaintiff was seen by Dr. Alarion. Id. At that appointment, the plaintiff was allegedly told he would be seeing the specialist in three weeks. Id. Nevertheless, the plaintiff asserts that his cast smelled so bad, and caused such excruciating pain, that he finally removed it himself. Id. Later that night, the plaintiff took a shower to "wash the stink off his arm." Id. However, while showering, the plaintiff asserts he slipped and fell on his arm again. Id. The plaintiff immediately reported the incident to Officer Williams, who called the medical department and spoke with a nurse. Id. The plaintiff was escorted to the medical department by another inmate where he was examined by two nurses. Id. at 6-7.

After examining the plaintiff, one of the nurses called Dr. Ahazumma who wanted to know why the plaintiff removed his cast. Id. at 7. The plaintiff told him the reasons he removed the cast. Id. After talking with Dr. Ahazumma, one of the nurses placed a cardboard splint on the plaintiff's wrist and told him that he had re-broken the wrist. Id. The

plaintiff was also given an appointment slip to see a doctor the next day.  Id.

At 8:03 a.m. the next day, the plaintiff arrived for his appointment with the doctor. Id.  The plaintiff was seen by Dr. Alarion who allegedly told him there was nothing more that could be done.  Id.  When the plaintiff went back into the lobby, the Warden, two officers, paramedic Gossit, and Dr. Alarion also came into the lobby.  The plaintiff asserts that the Warden told him that he would be getting nothing more for his arm and to not ask for anything else.  Id.  The Warden supposedly acknowledged that the plaintiff had written a BP-8 and BP-9 administrative remedy to him, asking for help in receiving proper care for his injured arm.  Id. at 8.  The Warden allegedly threatened to lock the plaintiff up if he asked for anything again.  Id.

The plaintiff asserts that the Warden also advised Dr. Alarion that if the plaintiff came back to medical seeking treatment for his arm, the doctor was to call the Warden, so he could lock him up.  Id.  The plaintiff also alleges that the Warden asked the nurse why the plaintiff was given a splint, but the plaintiff was unable to hear the nurse's response.  Id. The Warden, however, stepped back into the lobby and told the plaintiff that he was lucky to have the splint.  Id.  As a result of these events, the plaintiff alleges that he filed a second BP-8 administrative remedy.  Id.

Attached to the Complaint are what is purportedly the plaintiff's attempt to file administrative remedies.  Id. at Ex. 1-3.  The plaintiff asserts that his remedies were thrown away, that his signature was forged on them, or that they were lost or ignored.  Id. at 9.  On August 31, 2010, the plaintiff asserts that he was told by Mr. Boyd, the Health Services Administrator, that the plaintiff's remedies had been dropped.  Id.  The plaintiff asserts that

this is untrue and that his signature was forged on those documents. Id. Moreover, the plaintiff contends that he gave copies of his BP-8 and BP-9 administrative remedy forms directly to the Warden on August 25, 2010. Id. The Warden said he would look into the matter. Id. On September 13, 2010, the plaintiff received a response from the Warden stating that the plaintiff had been receiving medical care for his arm injuries. Id. at Ex. 9. On September 14, 2010, the plaintiff filed another informal administrative remedy alleging that he had not been receiving proper treatment for his arm. Id. at Ex. 10. The plaintiff asserts that he never received a response. Id.[1]

After this time, the plaintiff continued to seek medical attention for his injured arms. Id. at 11. Moreover, he continued to seek pain medication, but never received any. Id. During this time, the plaintiff contends that a "blood egg" formed on his arm to which he applied ice. Id. He could also feel his bones rubbing together. Id.

On September 27, 2010, as the plaintiff was pushing himself up from a table, he felt the bones in his wrists pop, and noticed that the "blood egg" got bigger. Id. On September 29, 2010, the plaintiff asserts that he spoke with Mrs. Doyle who advised him that a panel had convened to discuss the plaintiff's arm injuries and decided that further medical intervention was appropriate. Id.

On October 1, 2010, the plaintiff went to see Dr. Ahazumma. Id. At that time, the specialist, Dr. O'Malley, was also present, and the plaintiff was told he could have his cast cut off. Id. at 11-12. The cast was not removed. Id. at 12. At this appointment, Dr. Alarion

---

[1] Defendants object to the magistrate judge's finding that a question of fact exists as to whether staff interfered with the plaintiff's ability to properly exhaust administrative remedies. This Court finds it unnecessary to delve into the issue of exhaustion.

asked the plaintiff why he had not come to medical after he fell in the shower. Id. The plaintiff stated that he had come to medical. Id. The plaintiff contends that Dr. Alarion then advised him he was scheduled to see a surgeon the next week. Id. Moreover, Dr. O'Malley told the plaintiff that he would have pain for the rest of his life, and wrote the plaintiff a prescription for Tylenol 3. Id. The plaintiff alleges, however, that he never received the medication. Id. The plaintiff asserts that he asked for his medication on October 13, 2010, but was told that the doctor had not "signed off" on the prescription and that he could not receive it. Id.

On October 15, 2010, the plaintiff was taken to see an outside specialist. Id. At the time, the plaintiff thought he was going for surgery; however, that appointment was merely for a second opinion. Id. At that appointment, the plaintiff was again x-rayed. Id. The specialist allegedly told the plaintiff that he could perform surgery on the plaintiff's arms and fix his injuries in 45 minutes. Id. However, the officer escorting the plaintiff to the appointment stated that surgery was not on the orders, and the plaintiff was returned to the BOP with nothing more than a prescription for pain medication. Id. at 13. Upon arrival, Mrs. Church allegedly tore up the plaintiff's prescription saying, "you don't need this." Id.

On October 19, 2010, the plaintiff asserts that he returned to the medical department and asked for a wrist brace. Id. He was allegedly told that they did not have any. Id. The plaintiff requested an administrative remedy form and mailed it out the next day. Id.

As a result of these alleged events, the plaintiff asserts that he is in need of emergency medical attention. Id. at 14. The plaintiff asserts that he cannot use his hand properly and there are bones pushing up against his skin causing excruciating pain. Id.

The plaintiff asserts that he has suffered various injuries and that he is entitled to an award of damages. Id. Moreover, he seeks proper medical attention, including surgery on his wrist. Id.

B.    Documented Medical Records

The plaintiff's medical records establish the following with regard to the treatment of his injured hands and wrists:

(1) On May 6, 2010, the plaintiff reported to Health Services at approximately 7:06 a.m. alleging that he injured himself upon falling out of the top bunk. [Doc. 28], Defs.' Ex. 2, Declaration of Brett Friend ("Friend Declaration") at ¶ 4, Att. A. At that time, the plaintiff reported that both of his hands were broken and he felt dizzy. Id. The plaintiff was referred to x-ray and was prescribed 800 mg of Ibuprofen every six hours for three days. Id.

(2) Due to multiple fractures on both wrists, at 9:23 a.m. medical staff applied a full cast on plaintiff's left hand and a partial cast on the plaintiff's right hand. Id. at ¶ 5, Att. A. He was also referred for a consult with an orthopedic specialist. Id.

(3) On May 10, 2010, the plaintiff was again seen by a health services physician. Id. at ¶ 6, Att. A. At that time, it was noted on the plaintiff's medical chart that his fingers were warm, there was no skin discoloration, his pain had decreased, and he could perform his daily activities. Id.

(4) The plaintiff received an orthopedic consult on May 26, 2010. Id. at ¶ 7, Att. A. It was recommended that the plaintiff receive a consult for orthopedic surgery. Id.

(5) Upon his return to the facility, the plaintiff received a follow-up examination with

a health services physician.  Id. at ¶ 8, Att. A.

(6) On June 8, 2010, the plaintiff reported to health services contending that he had fallen in the shower the previous evening.  Id. at ¶ 9, Att. A.  It was observed that the plaintiff did not have a cast on his left arm.  Id.  Moreover, it was noted that he had movement in his arm and there was no further pain or swelling.  Id.  The plaintiff was advised to keep his left wrist immobile and an Ace bandage was applied.  Id.  Follow-up x-rays were requested and it was noted that the plaintiff was due to see the orthopedic surgeon on June 24, 2010.  Id.

(7) On June 10, 2010, the plaintiff reported to health services complaining of pain in his right wrist and hand from falling in the shower the previous day and breaking the cast on his right forearm.  Id. at ¶ 10, Att. A.  No skin discoloration was present and only minimal swelling.  Id.  An x-ray was taken which revealed a displaced fracture.  Id.  The plaintiff was prescribed Acetaminophen/Codeine 300/30 two times a day for seven days.  Id.

(8) On June 14, 2010, a second cast was placed on the plaintiff's left wrist.  Id. at ¶ 11.

(9) On June 17, 2010, the plaintiff had an orthopedic consultation with Dr. O'Malley at Mountainstate Orthopedic Associates, Inc.  Id. at ¶ 12, Att. B.  At that appointment, the plaintiff reported having stiffness and swelling in his right hand.  Id.  Dr. O'Malley opined that in order to restore some sort of improved anatomy to the plaintiff's wrist, a large operative procedure would be required.  Id.  Alternatively, they could allow the plaintiff's fracture to continue healing for two to three weeks and then concentrate on regaining wrist flexion and extension.  Id.  Once that happened, the plaintiff could elect to have a resection

of the distal ulna.  Id.  The plaintiff chose to not have surgery at that time, but to allow the fracture to heal and then have physical therapy.  Id.  Dr. O'Malley therefore applied a short arm cast and scheduled the plaintiff for further x-rays to determine whether his radius had adequately healed.  Id.  Dr. O'Malley also stated that it would take several months for the plaintiff to regain his full range of motion and be considered a candidate for distal ulna resection.  Id.

(10) When the plaintiff arrived back at the facility, he received an institutional follow-up where it was noted that he had received a short arm cast on his left forearm and that his fingers were mobile and without discoloration or swelling.  Id. at ¶ 13, Att. A.

(11) On July 27, 2010, the plaintiff reported to health services that he had struck his casted arm on a door frame the previous week and that he was in pain.  Id. at ¶ 14, Att. A. Although no swelling or discoloration was noted on his hand, x-rays were ordered.  Id.

(12) On August 18, 2010, the plaintiff reported to health services complaining of pain in his left wrist.  Id. at ¶ 15, Att. A.  He also requested a surgery consult which was granted and scheduled.  Id.

(13)  On  September  7,  2010,  the  plaintiff  again  reported  to  health  services complaining of pain in his casted left arm.  Id. at ¶ 16, Att. A.  He was referred to a physician and seen later that day.  Id.  The doctor noted that the plaintiff had full range of motion and normal circulation.  Id.  The plaintiff was prescribed Ibuprofen 800 mg every 12 hours for 90 days.  Id.

(14) On September 23, 2010, the plaintiff reported to health services complaining that he had fallen onto his left wrist the previous evening.  Id. at ¶ 17, Att. A.  At that time,

he had decreased range of active and passive motion, and that the wrist appeared deformed, although it could not be determined whether that deformity resulted from the new injury or a previous one. Id. Further, his left hand was warm to the touch and displayed positive capillary refill even though there was limited range of motion. Id. The plaintiff received a cardboard splint and was told to report to health services the following day. Id.

(15) The plaintiff reported to health services on October 1, 2010. Id. at ¶ 19, Att. A. He complained about his cast but was told by Dr. Azumah that these issues had already been addressed. Id.

(16) On October 5, 2010, the plaintiff received another orthopedic consult with Dr. O'Malley. Id. at ¶ 20, Att. C. New x-rays were taken which showed that the left wrist fracture was completely healed with some malposition. Id. Dr. O'Malley found that the best treatment option at that time was to conduct warm soaks and active range of motion exercises for a few months to try to regain full motion and function in the hand. Id. Additionally, Dr. O'Malley noted that a lot of people with the plaintiff's type of deformity did very well without surgery. Id. Dr. O'Malley outlined two different surgical options that the plaintiff could elect to correct his deformity, but recommended surgery only if the plaintiff became symptomatic with carpal instability pattern later on. Id. Dr. O'Malley noted that the plaintiff did not have carpal instability at that time. Id. Because Dr. O'Malley found that the plaintiff had "years to address the problems down the road," he stated that he would continue to see the plaintiff as needed. Id.

(17) After returning to the facility, the plaintiff received a follow-up consultation with health services. Id. at ¶ 21, Att. A. The plaintiff was advised to return to health services

in one week after receipt of Dr. O'Malley's report to form a plan of care. Id.

(18) On October 19, 2010, the plaintiff returned to health services to discuss Dr. O'Malley's recommended plan of care. Id. ¶ 22, Att. A. The plaintiff indicated that he understood the plan of care and requested a wrist brace for stability of his left wrist. Id. A brace was ordered. Id.

III.    Summary Judgment Standard

Rule 56(e) of the Federal Rules of Civil Procedure provides that "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must– by affidavits or as otherwise provided in this rule– set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party."

Rule 56 further provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Thus, the Court must conduct "the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

Additionally, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." ***Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.***, 475 U.S. 574, 586 (1986). That is, once the movant has met its burden to show absence of material fact, the party opposing summary judgment must then come forward with affidavits or other evidence demonstrating there is indeed a genuine issue for trial. Fed. R. Civ. P. 56(c); ***Celotex Corp.***, 477 U.S. at 323-25; ***Anderson***, 477 U.S. at 248. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." ***Id***. at 249 (citations omitted).

IV.    Analysis

A.    **Plaintiff's Deliberate Indifference Claim**

The Eighth Amendment expressly prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. . . . "[D]eliberate indifference entails something more than mere negligence," ***Farmer v. Brennan***, 511 U.S. 825, 835 (1994), but indifference can be manifested by prison doctors intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. ***Estelle v. Gamble***, 429 U.S. 97, 104-05 (1976).

To state a claim under the Eighth Amendment for ineffective medical assistance, the plaintiff must show that the defendants acted with deliberate indifference to his serious medical needs. ***Estelle***, 429 U.S. at 104. To succeed on an Eighth Amendment cruel and unusual punishment claim, a prisoner must prove: (1) that objectively the deprivation of a basic human need was "sufficiently serious," and (2) that subjectively the prison official acted with a "sufficiently culpable state of mind." ***Wilson v. Seiter***, 501 U.S. 294, 298

(1991).

A "serious" medical condition is one that has been diagnosed by a physician as mandating treatment or that is so obvious that even a lay person would recognize the need for a doctor's attention. *Gaudreault v. Municipality of Salem, Mass.*, 923 F.2d 203, 208 (1st Cir.), *cert. denied*, 500 U.S. 956 (1991). A medical condition is also serious if a delay in treatment causes a life-long handicap or permanent loss. *Monmouth County Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir.), *cert. denied*, 486 U.S. 1006 (1988).

The subjective component of a cruel and unusual punishment claim is satisfied by showing that the prison official acted with deliberate indifference. *Wilson*, 501 U.S. at 303. A finding of deliberate indifference requires more than a showing of negligence.[2] *Farmer v. Brennan*, 511 U.S. at 835. A prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

A prison official is not liable if he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the fact gave rise was insubstantial or nonexistent." *Id*. at 844. "To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment, [or lack thereof], must be so grossly incompetent,

---

[2] This Court notes that the plaintiff's Complaint includes a Federal Tort Claims Act ("FTCA") suit against the United States. Defendants assert, and the plaintiff does not dispute, however, that he has not filed any administrative tort claim with the BOP for medical negligence. Plaintiff argues that he should not have to exhaust his administrative remedies for his FTCA claim. The disposition of a tort claim by a federal agency, however, is a prerequisite to initiating a suit in the district court. 28 U.S.C. § 2675. Accordingly, the plaintiff's intentional tort claims – medical negligence and medical malpractice – must be **DISMISSED WITHOUT PREJUDICE** for failure to exhaust.

inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990). Additionally, mere disagreement between the inmate and the prison's medical staff as to the inmate's diagnosis or course of treatment does not support a claim of cruel and unusual punishment unless exceptional circumstances exist. *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985). A constitutional violation is established when "government officials show deliberate indifference to those medical needs which have been diagnosed as mandating treatment, conditions which obviously require medical attention . . .." *See Morales Feliciano v. Calderon Serra*, 300 F.Supp.2d 321, 341 (D.P.R. 2004) (citing *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003)).

I.

It is not disputed that Sanders' injuries necessitated serious medical attention – which the record shows he received. *See Martin v. Bowman,* 48 F.3d 1216 (4th Cir. 1995) ("A medical need is serious if it is diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would recognize the necessity for a doctor's attention."). Indeed, as shown at length above, numerous steps were taken toward evaluating and determining the most effective treatment for Mr. Sanders' injuries. This Court finds the "deliberate indifference" analysis of Sanders' Eighth Amendment claim is simple: rather than arguing that he received no medical treatment, Sanders only alleges that the defendants' conservative course of treatment violates his Eighth Amendment rights, and since he was seen numerous times by prison medical staff and outside medical specialists, defendants were not deliberately indifferent.

The Fourth Circuit has held in an unpublished opinion, that where prison officials are aware of a serious medical need and delay treatment, the plaintiff's allegations are sufficient enough to satisfy the objective component of a deliberate indifference suit. *See* **Clinkscales v. Pamlico Corr. Facility**, 238 F.3d 411 (4th Cir. 2000) (inmate sufficiently alleged deliberate indifference as a result of defendant's nine-month delay in providing a necessary surgery) (citing **Monmouth County Corr. Inst. Inmates v. Lanzaro**, 834 F.2d 326, 346-47 (3d Cir. 1987) (prison officials may not interminably delay medical treatment or deny treatment based on arbitrary and burdensome procedures). Here, Sanders has presented no evidence, when viewed in a light most favorable to him-as is required, sufficient to create a triable issue of material fact as to whether there ever existed a medically necessary treatment capable of delay. Simply put, the surgery was never deemed "medically necessary," but rather "elective," and treatment was not delayed. The documented evidence shows that Sanders' injuries were addressed immediately: casts were applied to both arms, pain medication was administered, and medical monitoring was ongoing. Accordingly, this Court finds these claims must fail.

As the medical reports described at length above show, the plaintiff was treated and observed on multiple occasions from the May 6, 2010, accident through the end of October of 2010, when a Dr. O'Malley and the plaintiff settled on a plan of care. Of most significance, the same morning of the accident, medical staff applied casts to the plaintiff's hands and referred him for a consult with an orthopedic specialist. Id. at ¶ 5. This consult occurred in fewer than three weeks. Id. at ¶ 7. In the interim, the plaintiff's condition was monitored by a health services physician whose medical chart indicates that the plaintiff's

pain had decreased, and he could perform his daily activities.  Id. at ¶ 6.

Following the orthopedic consult, a series of unfortunate events took place which hindered the plaintiff's recovery.  First, the plaintiff decided to self-remove the cast on his left arm.  That night, he fell in the shower.  As a result, the plaintiff suffered additional pain, and an x-ray indicated a displaced fracture.  A new cast was placed on his wrist.  A few weeks later, the plaintiff struck his casted arm on a door frame and reported he was in pain.  Again, on September 22, 2010, the plaintiff reported to health services complaining he suffered a fall onto his left wrist, creating a decreased range of motion and a deformity.

With these aggravating circumstances and series of exasperating injuries, the medical staff continued to monitor the same.  X-rays were ordered, surgical consults were scheduled (which the plaintiff refused), casts were reapplied, pain management and physical therapy was explored, medical follow-ups to health services were accomplished weekly, etc.  Id.

Plaintiff further contends that Dr. O'Malley found surgery was necessary to correct his injuries, and that the defendants have failed to provide him with the same.  As the R&R indicates, this claim is clearly refuted by the record.  On October 5, 2010, the plaintiff received another orthopedic consult with Dr. O'Malley.  Id. at ¶ 20, Att. C.  New x-rays were taken which showed that the left wrist fracture was completely healed with some malposition.  Id.  Dr. O'Malley found that the best treatment option at that time was to conduct warm soaks and active range of motion exercises for a few months to try to regain full motion and function in the hand.  Id.  Additionally, Dr. O'Malley noted that a lot of people with the plaintiff's type of deformity did very well without surgery.  Id.  Dr. O'Malley outlined

two different surgical options that the plaintiff could elect to correct his deformity, but recommended surgery only if the plaintiff became symptomatic with carpal instability pattern later on. Id. Dr. O'Malley noted that the plaintiff did not have carpal instability at that time. Id. Therefore, Dr. O'Malley found that the plaintiff had "years to address the problems down the road . . .."

For the above-stated reasons, this Court finds that the plaintiff fails to make a sufficient showing from which a jury could conclude the defendants were personally involved in a violation of his constitutional rights, or that the defendants were deliberately indifferent to his serious medical needs. Accordingly, these claims must fail.

## II.

The supervisory defendants should also be dismissed. In *Miltier v. Beorn*, 896 F.2d at 854, the Fourth Circuit recognized that supervisory defendants may be liable in a *Bivens* action if the plaintiff shows that: "(1) the supervisory defendants failed to provide an inmate with needed medical care; (2) that the supervisory defendants deliberately interfered with the prison doctors' performance; or (3) that the supervisory defendants tacitly authorized or were indifferent to the prison physicians' constitutional violations." In so finding, the Court recognized that "[s]upervisory liability based upon constitutional violations inflicted by subordinates is based, not upon notions of respondeat superior, but upon a recognition that supervisory indifference or tacit authorization of subordinate misconduct may be a direct cause of constitutional injury." *Id*. However, the plaintiff cannot establish supervisory liability merely by showing that a subordinate was deliberately indifferent to his needs. *Id*. Rather, the plaintiff must show that a supervisor's corrective inaction amounts to deliberate

indifference or tacit authorization of the offensive practice. *Id*. In reviewing claims of medical care, supervisors are entitled to rely on the judgment of the medical staff as to the course of treatment prescribed. *Id*.

Typically, a suit against Government agents acting in their official capacities is considered a suit against the United States itself. *See **Kentucky v. Graham***, 473 U.S. 159, 165 (1985) ("Official-capacity suits . . . 'generally present only another way of pleading an action against an entity of which an officer is an agent.'"). Remedy under ***Bivens***, however, is against federal officials in their individual capacities, not the federal Government.

"Official capacity suits generally represent an action against an entity of which an officer is an agent . . .." ***Monell v. Dep't of Soc. Servs.***, 436 U.S. 658, 690 n. 55 (1978). Moreover, the Eleventh Amendment bars suits against the State unless the State has waived its immunity. ***Will v. Michigan Dept. of State Police***, 491 U.S. 58, 66 (1989). In this case, claims against the defendants in their official capacities would be claims against the state and thus barred by the Eleventh Amendment immunity. However, the plaintiff does not sue the defendants in their official capacities. In fact, the Complaint specifically states that the defendants are being sued in their individual capacities.

As for the defendants' defense of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." ***Harlow v. Fitzgerald***, 457 U.S. 800, 818 (1982). The two-part test for qualified immunity is whether (1) the facts alleged "show

[that] the . . . conduct violated a constitutional right" and (2) the constitutional right in question was clearly established such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." **Saucier v. Katz**, 533 U.S. 194, 201-202 (2001).

For the reasons articulated above, this Court finds that the plaintiff has failed to provide evidence upon which, if proved, a reasonable jury could find that these defendants tacitly authorized or were indifferent to an alleged violation of Sanders' constitutional rights. It is clear that the advice of medical staff was provided to them in their official capacities. Because they are not medical personnel, such reliance was completely reasonable and appropriate. See **Miltier v. Beorn**, 896 F.2d at 854. Furthermore, in this case, it seems overwhelmingly prudent for these defendants to follow such advice, given the extensive efforts to diagnose, monitor, and control Sanders' injuries, which has led this Court to find that there was no disregard any "risk of harm of which [they] were aware." See **Johnson v. Quinones**, 145 F.3d 164, 168 (4th Cir. 1998).

### B.    Pain Medications

In the magistrate judge's R&R, it is recommended that the plaintiff's claim of deliberate indifference be allowed to proceed insofar as he alleges the pain medications proscribed to him were never given. This Court respectfully disagrees. As previously noted, deliberate indifference is an extremely high standard to meet. In order to prevail, the plaintiff must establish the defendants denied treatment, purposefully gave improper treatment, or ignored medical complaints. As previously established, the plaintiff received adequate treatment for his "serious" medical needs. Furthermore, even "[i]n situations

where the deficiencies in medical treatment w[as] minimal [which is not the case here], *pain alone* does not constitute a constitutional violation." ***Mayweather v. Foti***, 958 F.2d 91 (5th Cir. 1992) (emphasis added) ("Continuing back pain is unpleasant. Its existence does not, however, in and of itself demonstrate that a constitutional violation occurred.").

Once a prisoner establishes deliberate indifference to his serious medical needs, he may then recover damages for pain he suffered during the delay of treatment. *See **Easter v. Powell***, 467 F.3d 459, 464-65 (5th Cir. 2006). This Court further notes the plaintiff's medical records indicate that his pain had decreased within a few days of the initial accident. (Doc. 28 at ¶ 6). Again, upon removing his own cast and falling in the shower, medical records noted there was no further pain or swelling. Id. at ¶ 9.

This Court does not suggest that any instance of pain cannot support a claim for deliberate indifference. As the Supreme Court has held, the test for deliberate indifference is whether there exists a "substantial risk of serious harm." ***Farmer v. Brennan***, 511 U.S. at 837. Indeed, in the context of specific instances of pain, courts have found that a jury could find deliberate indifference where sources of pain are unknown, and where they are indicative of a more serious, undiagnosed medical issue. For instance, in ***Sealock v. Colorado***, 218 F.3d 1205 (10th Cir. 2000), the Court reversed the district court's grant of summary judgment in favor of the prison officials where plaintiff was exhibiting chest pains and vomiting, and where testimony was presented that these are well-known signs of a heart attack. In that case, the plaintiff was, in fact, having a heart attack. Similarly, in ***Blackmore v. Kalamazoo County***, 390 F.3d 890 (6th Cir. 2005), the Court reversed the district court's grant of summary judgment where the detainee complained of sharp

stomach pain over a two-day period and vomited, which evidence showed are classic signs of appendicitis. The plaintiff was later admitted for an appendectomy.

The above-mentioned cases are extraordinary and clearly distinguishable from the case *sub justice*. In this case, the source of the plaintiff's pain was known and was promptly treated. The plaintiff makes no allegations, nor does anything in the record suggest that the pain the plaintiff has suffered is a sign that a "substantial risk of serious harm" exists. The harm resulted from a series of unfortunate accidents, attributable to no one, and the medical staff quickly took appropriate measures to correct the plaintiff's injuries. Unfortunately, pain is often a part of the healing process. This does not, however, violate a prisoner's constitutional rights. Therefore, this Court finds that no such deliberate indifference to the plaintiff's serious medical needs; i.e. his broken arms/wrists – can be proven. As such, the plaintiff's claims of resultant pain, standing alone, must fail. This Court finds the later simply provides a measure of damages for the former, if proven. Having found no deliberate indifference, this Court hereby must **DENY** any relief for the alleged failure to provide pain medication.

V.    Conclusion

Upon careful review of the above, this Court hereby **ADOPTS IN PART** and **DECLINES TO ADOPT IN PART** the magistrate judge's **Opinion/Report and Recommendation [Doc. 40]**. Further, the plaintiff's Objections **[Docs. 43, 53, 62 & 63]** are hereby **OVERRULED**. Accordingly, the Court is of the opinion that the Motion to Dismiss, or in the Alternative, for Summary Judgment **[Doc. 24]** should be, and the same hereby is, **GRANTED**. Insofar as this Court finds it unnecessary to address the merits of

the defendants' Objections **[Doc. 46]**, the same are hereby **MOOT**.  It is further **ORDERED** that the Clerk enter a separate judgment for the defendants and that this matter be **STRICKEN** from the active docket of this Court.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to any counsel of record and to mail a copy to the *pro se* plaintiff.

**DATED:** July 20, 2011.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE